**Affirmed and Opinion Filed February 13, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00966-CV

### IN THE MATTER OF L.W., A JUVENILE

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JD-18-01485-W**

# MEMORANDUM OPINION

Before Justices Whitehill, Partida-Kipness, and Pedersen, III
Opinion by Justice Partida-Kipness

The juvenile court certified L.W. to be tried as an adult and transferred the criminal proceedings to a criminal district court. On appeal, L.W. argues the juvenile court's certification and transfer order was deficient and lacking in specificity to waive its jurisdiction and asserts the evidence presented was legally and factually insufficient to support the trial court's decision to transfer the case to criminal district court. We affirm. Because all issues presented are settled in law, we issue this memorandum opinion. TEX. R. APP. P. 47.4.

## BACKGROUND

L.W. is charged with one count of capital murder, four counts of aggravated sexual assault, two counts of aggravated assault, and one count of burglary of a habitation. The charges relate to offenses against seven different complainants in four separate incidents occurring between September 12, 2018 and November 27, 2018. L.W. is alleged to have used or exhibited a deadly

weapon (a firearm) in each offense. L.W. was born on January 27, 2003 and was fifteen years old at the time the offenses are alleged to have occurred. The State petitioned for discretionary transfer to adult district court for criminal proceedings against L.W. concerning those felony offenses. The juvenile court ordered the psychological evaluation, diagnostic study, social evaluation, and full investigation into the child, his circumstances, and the circumstances of the alleged offenses required by family code section 54.02(d).

After the social study and evaluations were completed, the juvenile court conducted a hearing on the State's petition for discretionary transfer. The juvenile court took judicial notice of the contents of the court's file, including the May 2, 2019 Report of Psychological Evaluation: Fitness to Proceed and corrected copy dated June 3, 2019, June 13, 2019 Report of Psychological Evaluation and Diagnostic Study Addendum, and July 16, 2019 Social Evaluation and Investigative Report. At the hearing, the State presented testimony from three Dallas police detectives, the probation officer assigned to the court assessment unit of the Dallas County juvenile probation department, and the Assistant Chief Psychologist for the Dallas County Juvenile Department. L.W. presented testimony from his mother, a foster mother he lived with in 2013, the Clinical Supervisor of the sexual behavior treatment program (SBTP) for the Texas Juvenile Justice Department (TJJD), and another employee of the TJJD.

### A. The November 27 Aggravated Sexual Assault and Murder

On November 27, 2018, twenty-three-year-old M.E.[1] was raped and murdered in her home. Dallas Police Detective Scott Sayers was tasked with investigating her death. At the transfer hearing, Sayers testified that M.E.'s boss, F.L., had received a text from M.E. earlier that evening about an individual who had asked to borrow her phone to call for an Uber and then asked to wait

---

[1] Given the nature of these offenses and privacy considerations, all victims and witnesses are referred to by initials. The initials used correspond to the names used in the documents included in the Court's record, some of which are pseudonyms.

there because it was cold. M.E. stated in her text that she did not know what to do. F.L. thought M.E. was in her car, not her apartment, so his initial response was "Lol if he doesn't look homeless it's okay. Dial on speaker. Don't let him touch it." F.L. then seemed to realize something was not right with the situation and sent another text to M.E.: "Wait where? Hold up. It's not that cold." When M.E. did not respond to these and two additional text messages, F.L. contacted M.E.'s boyfriend, C.M., to see if he had heard from M.E. C.M. had not heard from her, so he drove from Denton, which is where he lived, to M.E.'s apartment in Dallas. When C.M. arrived at the apartment, he saw M.E. through a window lying face down on the floor. He called 911 and, while on the phone with 911, C.M. kicked the door in, found M.E. lying on the ground, flipped her over, and tried to revive her through CPR. When EMS arrived, they determined M.E. was already deceased. F.L. and C.M. were transported in separate squad cars to police headquarters to be interviewed. They both voluntarily provided DNA samples through buccal swabs and turned over their phones for forensic inspection. Their DNA did not match DNA collected from the scene.

When Sayers surveyed the crime scene, he saw that M.E.'s pants were down, which indicated she had been raped, her fingernails were bent back, which indicated there had been a struggle, and there were signs of strangulation. He also saw a substance on M.E.'s right upper hip that he thought could be sperm. The medical examiner determined the cause of death was homicide due to strangulation. During the autopsy, the medical examiner collected swabs of the substance on M.E.'s right hip, swabs from M.E.'s neck, vagina, and anus, M.E.'s fingernail clippings, and M.E.'s blood sample. That evidence was sent to the Southwest Institute of Forensic Science (SWIFS) for DNA testing.

When Sayers met with M.E.'s family, he determined that M.E.'s phone and laptop were potentially missing. M.E.'s father had a paid app through AT&T that allowed him to track M.E.'s

phone and laptop. The laptop would be identifiable if found because it had unique stickers on the outside and M.E.'s user name and possibly her father's username would appear when someone opened the laptop. On November 28, 2018, M.E.'s father and detectives used the app to locate the laptop. The app showed the laptop pinging in an apartment complex nearby. Detectives could tell someone was using the laptop because the app showed the laptop had 40-50% power remaining and was losing power. But the laptop was not moving, and they could not pinpoint the laptop's location to a specific apartment unit. The DPD deployment unit decided to surround the apartment complex, send officers door-to-door asking if somebody purchased a laptop or phone off of the street, and, if they arrived at an apartment where they thought the laptop was located, instruct M.E.'s father to send an alert to the device to make it ring.

M.E.'s father sent the alert as Officer Kazel was knocking on L.W.'s apartment door, but none of the officers on scene heard the alarm. The laptop was no longer detected on the app, however, so officers knew whoever was using it turned it off. L.W.'s mother answered the door and spoke with Kazel. When asked if she was the only one home, she said her fifteen-year-old son was also there. Kazel spoke to L.W. and his mother, and L.W. told Kazel he had bought a laptop from a homeless man at the Valero station down the street for $150. L.W. and his mother showed the laptop to Kazel, and Kazel identified it as M.E.'s laptop from the stickers on the outside and M.E. listed on the screen as one of the users.

When Sayers arrived at the apartment, he also spoke with L.W. and his mother. At that point, Sayers thought L.W. bought the laptop from a potential suspect. He hoped L.W. could lead Sayers to who actually took the laptop from M.E. and wanted to eliminate L.W. as a suspect. L.W. and his mother agreed to go to headquarters so Sayers could talk to L.W. about where L.W. got the laptop. On the way to headquarters, L.W. pointed out the Valero station and told Sayers

–4–

specifically where he bought the laptop. DPD officers located the homeless person L.W. said he bought the laptop from and transported him to headquarters for questioning. L.W. and his mother spoke to Sayers voluntarily at their apartment and at headquarters. Both signed consent to search forms for L.W. to provide a DNA buccal swab and his fingerprints. Sayers testified that L.W. was pleasant and cooperative during the interview and appeared to be a good kid. After his initial interview of L.W., Sayers believed L.W. bought the laptop from the actual suspect, but he did not think L.W. was the suspect in M.E.'s murder.

Sayers obtained the video recorded from cameras on the side and back of the Valero store on the date in question. He watched the recordings from an hour prior to and an hour after the time L.W. said he bought the laptop. Sayers did not see the homeless man on the side of the store during that time and did not see a laptop purchase.

The DNA results showed M.E. was sexually assaulted and her injuries, including the state of her fingernails, showed there was a struggle and M.E. fought back against her killer. The DNA analysis prepared by SWIFS from the swabs taken from M.E. during her autopsy linked L.W. to M.E.'s murder. L.W.'s DNA was found around M.E.'s neck, underneath her fingernails, in her vagina, in her anus, and on her hip. L.W. was arrested for M.E.'s murder. L.W.'s DNA profile was placed in the Combined DNA Index System (CODIS) and it matched the DNA profile of an unknown suspect in three unsolved aggravated sexual assaults that had occurred in Dallas in September and October 2018. It also matched two unsolved aggravated sexual assaults that occurred in Bossier City, Louisiana in the spring of 2018.

### B. The September 12, September 19, and October 30 Offenses

In the fall of 2018, Dallas Police Department detectives Todd Haecker and Brandi Kramer were investigating three aggravated sexual assault cases that had occurred in the same general area of Dallas County as M.E.'s murder. DNA collected at each crime scene confirmed that the same,

unknown suspect committed each sexual assault. Initially there was no match in CODIS with the unknown suspect's DNA profile. When the unknown suspect's DNA was compared to L.W.'s DNA profile from the M.E. case, however, there was a direct match identifying and linking L.W. to all of the offenses. In addition, a fingerprint obtained from the interior door of the apartment of the victim of the October 30 sexual assault matched the prints L.W. voluntarily submitted in the capital murder case of M.E.

Testimony from several witnesses at the hearing confirmed that each of the offenses appeared to be planned by L.W. using the same modus operandi. Specifically, he would approach the home, knock on the door, request money, water, or assistance of some kind, and then would go into the home, make physical contact with the complainants, and subsequently force having sexual intercourse with them. In each offense, L.W. threatened the complainant with a firearm, and in two of the cases L.W. threatened child witnesses with the firearm.

For example, at approximately 10:00 a.m. on September 12, 2018, J.K. had just finished taking a shower when she heard a knock on her apartment door. Because she was only wearing a towel, she cracked the door a little bit and asked the young male who knocked what he wanted. He asked her for a bottle of water. She shut the door, went to get the water, and when she came back with the water, she gave it to the male through a small crack in the door. He said thank you but then pushed his way through the door and waved a gun in her face. He told J.K. he wanted sex and threatened to kill her. As he pointed the gun at J.K.'s face, the attacker undid his pants and began touching himself to get an erection. When J.K. fought back, the attacker pushed her to the ground and penetrated her vagina and anus with his penis. While he was penetrating her, he put the gun on the ground and J.K. was able to grab the gun. She pointed the gun at him and pulled the trigger, but the safety was on. A struggle ensued, and the attacker was able to take the gun

back. J.K. then bit his wrist, which caused him to drop the gun and gave her the opportunity to run into the bathroom and hide in her bathtub. The attacker fled, and J.K. eventually ran out and called 911 from a neighbor's house.

At the hospital, J.K. told the physician that she had been choked and thought she was going to pass out and die during the assault. She had a sexual assault nursing examination (SANE) kit done at the hospital. Parts of the gun, her fingernail, and the blanket they landed on during the attack were collected at the crime scene. There was semen on the blanket. The SANE kit and everything collected at the crime scene were sent to SWIFS for testing. The DNA profile developed by SWIFS from that evidence was placed into CODIS and eventually matched to L.W.'s DNA profile from the M.E. case.

A similar scenario unfolded around 8:00 a.m. on September 19, when a young male knocked on the apartment door of B.H. and her two-year-old child, M.A.H. The male said he was trying to earn some extra money and asked if he could take out B.H.'s trash for a dollar or a couple of bucks. B.H. agreed and went back to get the money. When she returned to the door, the male produced a handgun, pushed his way into the apartment, and pointed the gun at everyone in the apartment including the child and the complainant, twenty-one-year-old D.H. He said he was there to take their "stuff," their property, and their money. When they told him they did not have any money, he said he was going to take something anyway, threatened them with the gun, and made them go to the back bedroom.

Detective Haecker testified that D.H. told him that the male pointed the gun at the child's head to gain compliance from the women and said he would kill the child if he did not get sex and money. He ordered B.H. and the child to go in the closet and then he raped D.H. in the bedroom. The assailant told D.H. that he had done this before, he knew the cops, and he was not worried

about getting caught. D.H. told Haecker that she felt the assailant had no regard for her life. After he finished the sexual act, the assailant wiped himself off with a t-shirt and left the apartment. He also stole money from the apartment

Haecker testified that he thought this case was related to the September 12 assault and it seemed the assailant's behavior was escalating because he had pointed a gun at and threatened to kill the victim and witnesses, including a child witness. The Dallas Police Department (DPD) called the canine team, Rescue One, to track the scent of the suspect from the t-shirt left at the scene. DPD also processed the physical evidence found at the crime scene. From information provided by either D.H. or B.H., a forensic sketch artist produced a forensic rendering of the suspect. Haecker testified that the sketch had a "pretty striking resemblance" to L.W. The DNA taken from the t-shirt ultimately linked to L.W. and matched the DNA collected from L.W. in the capital murder of M.E.

Haecker also testified regarding the October 30 offense, which occurred five to six miles from the other offense locations. This was another home-invasion style sexual assault that Haecker described as similar to the other cases. M.H. heard a knock on the door. When she answered the door, the assailant immediately forced his way in, pointed a gun at M.H. and her two-year-old-child, J.H., and demanded sex from M.H. While pointing the gun at the child, the assailant threatened to kill the child if M.H. did not comply and told her to lock the child in the bathroom. M.H. was concerned about locking her son in the bathroom alone, so she told the assailant that the child would cry and asked if she could put him in another room with the TV on. He said yes, she put the child in another room, and then she was taken to the back bedroom and sexually assaulted. Following the sexual assault, the assailant wiped himself off with a t-shirt and fled the scene.

The DPD processed the scene, dusted for fingerprints, and also brought in the canine unit to try and track the area as they did in the September 19 case. The DPD obtained a fingerprint from the interior door of the apartment. That print matched the prints L.W. voluntarily submitted in the capital murder case of M.E. The DNA profile developed from seminal fluid collected from the t-shirt left at the scene matched the DNA profiles from the September 12 and September 19 sexual assaults and L.W.'s DNA profile from the M.E. case. M.H. was shown a double-blind line-up after L.W. was found with M.E.'s laptop but before he was arrested for M.E.'s murder. M.H. picked L.W. out of the line-up as her assailant.

### C. Probable Cause Testimony

At the transfer hearing, Sayers testified there was probable cause to believe that, on November 27, 2018, L.W. committed the offense of capital murder in the course of committing an aggravated sexual assault in violation of section 19.03 of the Texas Penal Code. Sayers further testified there was probable cause to believe L.W. used a deadly weapon (his hands) to commit the offense. He confirmed the offense was against a person and L.W. was at least 15 years of age at the time the offense occurred. Sayers told the court he believed the public needed protection from L.W. He explained that, despite his twenty-five years as a DPD officer, thirteen of which he worked in homicide, he had no suspicion of L.W. after the first interview and believed that L.W. "kind of duped" him. Looking at how L.W. gained entry to the apartments in the other cases, Sayers believed L.W. "was very conniving, very good at what he did, very convincing."

Detective Kramer testified there was probable cause to believe that, on September 12, 2018, L.W. committed two counts of aggravated sexual assault against J.K. in violation of section 22.021 of the Texas Penal Code, used or threatened the use of physical force of violence and did use or exhibit a deadly weapon (a firearm), was at least fifteen years old at the time, and committed

the offenses against a person. Kramer also testified that she believed L.W.'s conduct was willful and violent and the public needed protection from L.W.

Detective Haecker testified as to probable cause for the September 19 and October 30 offenses. He testified that there was probable cause to believe that, on September 19, 2018, L.W. committed the offenses of burglary of a habitation in violation of section 30.02 of the Texas Penal Code, aggravated assault of M.A.H. in violation of section 22.02 of the Texas Penal Code, and aggravated sexual assault with a deadly weapon of D.H. in violation of section 22.021 of the Texas Penal Code. Haecker also testified that there was probable cause to believe that, on October 30, 2018, L.W. committed the offenses of aggravated sexual assault against M.H. in violation of section 22.021 of the Texas Penal Code and aggravated assault of J.H. in violation of section 22.02 of the Texas Penal Code. Haecker confirmed that L.W. used or exhibited a deadly weapon (a firearm) during the commission of each of these offenses and these offenses were felony offenses. Haecker further testified that he believed L.W.'s conduct was willful and violent and the public needed protection from L.W.

### D. The State's Other Evidence

The State presented two additional witnesses before resting its case. Dallas County Juvenile Probation Officer Chris Jefferson completed the court-ordered social evaluation and investigative report. Jefferson testified that he meets with L.W. in detention weekly and, at the time of the hearing, had met with L.W. at least 30 times. Jefferson testified that the juvenile probation department recommended the court grant the transfer to criminal district court. Jefferson described L.W.'s sophistication as "highly excessive" because of the nature of the allegations pending against him, the type of offenses alleged, including murder and aggravated sexual assaults, the use of a deadly weapon during the commission of the offenses to intimidate or force the complainants to comply, the victims' ages, which included two toddlers, the premeditation, and

the tactics used by L.W. in committing the offenses. Jefferson noted that it appeared that L.W. planned the offenses and used the same tactics in each offense. During his meetings with L.W., Jefferson recognized that L.W. can put on a friendly face when he has to, is manipulative, and knows how to use his immaturity and youthfulness when it is convenient to him. Furthermore, L.W. used those traits to gain access to his victims' homes and then produce a weapon and rape them.

Jefferson also stated he believes L.W. has a complete understanding of what is going on with these proceedings and he has no issue with L.W.'s fitness to stand trial as an adult. Jefferson found L.W.'s maturity to be age appropriate and stated L.W. knows how to function and make decisions. According to Jefferson, the reports also show that L.W. has impulsive aggression, uncontrollable anger, and incidents of lying. Jefferson told the court that while L.W. has been in detention, his actions placed staff and other youth in danger at times. L.W. had physical altercations with his peers, made physical contact with staff, threatened staff, threatened residents, spit at staff, and was found with contraband, including a comb that he made into a shank and threatened to use to stab a staff member. He also made a replica assault rifle out of paper and threatened to throw a cup allegedly containing his urine on a staff person.

According to Jefferson, L.W. is one of the worst juveniles he has ever seen. Jefferson does not believe the juvenile system can rehabilitate L.W. because L.W. will turn nineteen and be subject to release from the TJJD before completing even the three-year minimum stay needed for some of his offenses, let alone the ten-year stay attached to the capital murder charge. Because L.W. was over sixteen years old at the time of the hearing, he would have an opportunity to be released before completing the minimum stay, and Jefferson does not believe it is appropriate for L.W. to be released. Jefferson ultimately concluded that the likelihood of rehabilitation was remote

and L.W. was a threat to the welfare of the community. In Jefferson's opinion, L.W.'s background, the seriousness of the offenses, and the welfare of the community require criminal prosecution here. His recommendation was that the State's petition for discretionary transfer be granted.

Dr. Leilani Hinton, assistant chief psychologist for the Dallas County Juvenile Department, also testified. She prepared the report of psychological evaluation and fitness to proceed and the report of psychological evaluation and diagnostic study addendum for the hearing. Dr. Hinton found L.W. fit to assist in his own defense. She told the court that L.W. has the ability to help his attorney, is competent to stand trial, has the sufficient present ability to consult with his attorney with a reasonable degree of factual and rational understanding, appears to have knowledge of how to utilize the services through his attorney, possesses an appreciation of appropriate courtroom behavior and conduct as mandated by the code of criminal procedure, has an appreciation for the adversarial nature of the court proceeding mandated by the Code, has the capacity to testify, and is fit to testify.

Dr. Hinton testified that L.W. admitted he is easily angered, has difficulty controlling his expression of anger, and gets triggered and angry if he believes he is not listened to, called a liar, or yelled at by anyone. She noted that L.W. is likely to respond with extreme displays of anger when he loses control or is triggered. That explosive temper can lead to physical violence, and Dr. Hinton testified this is something the community should be concerned about.

Dr. Hinton also concluded that L.W. has the social skills necessary to be effective in social interactions. It was Dr. Hinton's opinion, however, that L.W. makes a choice whether he wants to use those skills in a given situation. She described L.W. as having two faces – either pleasant or angry – but he makes the choice as to how he appears. She found that L.W. is more sophisticated and more mature than others his age and he is also a danger to the community. She found that

treatment of L.W. would be fairly challenging and, as a result, there is a probability of relapse. Treatment will be very difficult with L.W. because he suffers from significant mental health and behavioral health issues that have been chronic and long standing. Dr. Hinton agreed that L.W. is a troubled young man and recommended L.W. be placed in a highly supervised environment.

### E.      L.W.'s Defense Witnesses

L.W. presented four witnesses in his defense. First, Dr. Jillian Erdberg, clinical supervisor of the sexual behavior treatment program (SBTP) for the TJJD, explained the treatment and program options available through the TJJD for juveniles who have committed sexual assaults. She described a year-long residential treatment program for sexual behavior treatment that provides treatment to the juvenile on understanding his offense, understanding himself and his life, understanding his victims, victim empathy, and the crime. She also described the assessment process L.W. would undergo if he was assigned to the program to make sure he received all medical and mental health treatments necessary for his rehabilitation. She testified that the TJJD would complete a risk assessment of L.W. as he nears his nineteenth birthday and recommend to the juvenile court whether he be transferred or released when he turns nineteen. Dr. Erdberg did not provide an opinion on whether L.W. would benefit from the department's programs.

L.W. next called Tammy Coy, who has worked with the TJJD for twenty-nine years. She explained what happens when a youth goes back to court for a release transfer hearing before their nineteenth birthday when the youth has been in treatment with the TJJD. She did not provide an opinion on whether L.W. would benefit from the department's programs.

P.E., who was L.W. and his brother's foster mother from July 2013 until January 2014, testified next on L.W.'s behalf. L.W. was ten years old when he lived with P.E. She described L.W. as a loving and happy boy who was fun to be around and very protective of P.E. and of L.W.'s biological mother. He loved to play the violin. But P.E. told the court that L.W. could go

from zero to 60 "like that." She testified that she could see his anger come up quickly, which concerned her. According to P.E., L.W. was prescribed psychotropic drugs at that time because he had been diagnosed with bipolar disorder and attention deficit disorder. P.E. testified the medications were to treat the attention deficit disorder. She told the court that she managed and adjusted L.W.'s medication while he was in her care. P.E. explained that when L.W. would get angry, he would be out of control and then shortly afterwards he would be OK; within thirty-five minutes or an hour he would grab P.E. and hug her and cry and calm down and go back to playing. She saw this happen a lot over the five months he lived with her. P.E. told the court that her older son had to restrain L.W. once. L.W. was removed in January 2014 because L.W. and his little brother had a big, violent fight, and L.W. had to be restrained. L.W. was sent to a residential treatment center in San Antonio. P.E. testified that she was very sad that CPS removed L.W. from her home. P.E. thinks that if CPS had let him stay with her, maybe some of this could have been prevented. She believes that L.W. has been victimized by the system.

L.W.'s final witness was his mother, J.R. She testified that CPS had been in and out of their lives since L.W. was two years old. He was removed from her home multiple times between 2004 and 2015. When he returned from the treatment center in San Antonio, the CPS action was terminated through a mediated settlement agreement, and L.W. returned to live with J.R. She testified that she noticed a very big change in L.W. when he returned from San Antonio and he "wasn't the person he was before he left." When it got to a point where J.R. could not get L.W. to calm down or L.W. would no longer speak with J.R., she knew she needed other help. So she had L.W. admitted for an observation assessment at various facilities, including Brentwood Psychiatric in Louisiana and Dallas Behavioral Health. L.W. also did not immediately have Medicaid to pay for the medications he needed, so J.R. went to those facilities for assistance in getting those

–14–

medications for her son. J.R. testified that when L.W. is medicated he is the sweetest child, and she has never experienced a time where L.W. would get very upset if his medications were being managed properly.

According to J.R., L.W. was not on his medications when the Texas offenses at issue here occurred because he did not have Medicaid at that time. But L.W. was getting his medications when they lived in Louisiana. J.R. testified that in Texas she "kept very much an eye on him, but he went to school," she went to work, and then they met back up in the evenings. She admitted, however, that she did not know until recently that these offenses happened during school hours. J.R. told the court that she thinks L.W. believes now that he needs help. She asked the judge to give L.W. the chance to get better. She feels that L.W. will get better with counseling, therapy, and medications because she has seen him at his best with those. She also testified that she believes L.W. was abused when he was in foster care.

## F. The Certification and Transfer Order

Following the two-day certification hearing on the State's petition, the juvenile court certified L.W. to be tried as an adult and transferred the criminal proceedings to a criminal district court. The juvenile court judge issued an eleven-page order on July 26, 2019, granting the State's motion for discretionary transfer and specifically stating the reasons for waiver. *See* TEX. FAM. CODE ANN. § 54.02(b). L.W. now appeals that order. *See id.* § 56.01(c)(1)(A).

### STANDARDS FOR WAIVER OF JUVENILE JURISDICTION

To waive its jurisdiction and transfer L.W. to adult criminal court, the juvenile court had to find that L.W.

(1) is alleged to have committed a felony,

(2) was fourteen years old or older at the time he is alleged to have committed the offense, and

–15–

(3) after a full investigation and a hearing there is probable cause to believe L.W. committed the offense alleged, and the welfare of the community requires criminal proceedings because of the seriousness of the offense alleged or L.W.'s background.

See TEX. FAM. CODE ANN. § 54.02(a)(1)–(3).

In making the determinations required in section 54.02(a), the juvenile court was required to consider, among other matters:

(1) whether the alleged offenses were against person or property, with greater weight in favor of transfer given to offenses against the person;

(2) L.W.'s sophistication and maturity;

(3) L.W.'s record and previous history; and

(4) the prospects of adequate protection of the public and the likelihood of L.W.'s rehabilitation by use of procedures, services, and facilities currently available to the juvenile court.

See id. § 54.02(f). These are nonexclusive factors that serve to facilitate the juvenile court's balancing of "the potential danger to the public" posed by the juvenile offender with his "amenability to treatment." *Moon v. State*, 451 S.W.3d 28, 38 (Tex. Crim. App. 2014) (quoting *Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999)). Family code section 54.02(h) requires that if the juvenile court waives jurisdiction, "it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court . . . ." TEX. FAM. CODE ANN. § 54.02(h); *Moon*, 451 S.W.3d at 49.

Although the order must show the juvenile court considered the four factors in section 54.02(f), the court "need make no particular findings of fact with respect to those factors." *Moon*, 451 S.W.3d at 41–42; *see also In the Matter of D.L.C.*, No. 06-16-00058-CV, 2017 WL 1055680, at *6 (Tex. App.—Texarkana Mar. 21, 2017, no pet.) (mem. op.) (recognizing that "there may be no reversible error even when the juvenile court's order seemingly restates the factors contained in Section 54.02, as long as the enumerated reasons were supported by evidence"). Further, the

court may order a transfer on the strength of any combination of the criteria listed in section 54.02(f). *Hidalg*o, 983 S.W.2d at 754 n.16; *In the Matter of K.M.D.*, No. 05-17-01284-CV, 2018 WL 3238142, at *2–3 (Tex. App.—Dallas July 3, 2018, no pet.) (mem. op.). The State has the burden to produce evidence that the waiver of jurisdiction is appropriate. *Moon*, 451 S.W.3d at 40.

**APPELLATE REVIEW**

Our review of a transfer order is two-pronged. First, we review the juvenile court's specific findings of fact concerning the section 54.02(f) factors under a "traditional sufficiency of the evidence review." *Moon*, 451 S.W.3d at 47. When reviewing the legal sufficiency of the evidence, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable fact finder could not reject the evidence. *In the Matter of S.G.R.*, 496 S.W.3d 235, 239 (Tex. App.—Houston [1st Dist.] 2016, no pet.). If there is more than a scintilla of evidence that supports the finding, then the proof is legally sufficient and the challenge fails. *Id.* When reviewing the factual sufficiency of the evidence, we consider all of the evidence presented to determine if the juvenile court's findings are so against the great weight and preponderance of the proof as to be clearly wrong and unjust. *Id.* But our review of the sufficiency of the evidence supporting waiver is limited to the facts the juvenile court expressly relied on in its transfer order. *Moon*, 451 S.W.3d at 50; *In the Matter of S.G.R.*, 496 S.W.3d at 239.

Second, we review the juvenile court's ultimate waiver decision for an abuse of discretion. *In the Matter of S.G.R.*, 496 S.W.3d at 239 (citing *Moon*, 451 S.W.3d at 47). A juvenile court abuses its discretion when its decision to transfer is essentially arbitrary, given the evidence upon which it was based. *Moon*, 451 S.W.3d at 47. "As with any decision that lies within the discretion of the trial court, the salient question is not whether we might have decided the issue differently." *In the Matter of S.G.R.*, 496 S.W.3d at 239. "Instead, we consider in light of our review of the sufficiency of the evidence whether the juvenile court's decision represents a reasonably principled

–17–

application of the Section 54.02(f) factors or was essentially arbitrary or made without reference to the statutory criteria for waiver." *Id.* (citing *Moon*, 451 S.W.3d at 47). As long as the juvenile court correctly applies these statutory criteria and complies with the requirement to specifically state its supporting findings, its waiver decision generally will pass muster under this standard of review. *Moon*, 451 S.W.3d at 49. "[A] juvenile court that shows its work should rarely be reversed." *Id.*

## ANALYSIS

In three issues, L.W. argues the juvenile court's certification and transfer order should be reversed because the order was deficient and lacking in specificity and the evidence presented was legally and factually insufficient to support the trial court's decision to transfer the case to criminal district court. We address each issue in turn.

### A. Issue One – Specificity of the Order

In his first issue, L.W. argues that the order should be vacated because it lacks the required specificity concerning the factual basis for the trial court's conclusions and grounds for transfer. According to L.W., although "the Court made all the findings required by § 54.02(a), she failed to state the reasons for reaching that decision but merely recites the evidence from the hearing." L.W. insists the court failed to "show its work" in its eleven-page order and, instead, merely recited evidence from the hearing.

In its transfer order, the juvenile court first made the specific findings required by section 54.02(a):

██████████████████████ The Court finds the Respondent to be a male child, born on the **27ᵗʰ day of January, 2003**, and being fifteen (15) years of age at the time of the acts upon which the Motion is founded and alleged to have occurred. The Court finds no adjudication hearing has been conducted concerning such acts. At the present time the Respondent is sixteen (16) years old. The parent of the Respondent is ████████████

The Court finds that said offense are felonies under the penal law of the State of Texas. The Court finds that the alleged offenses were against persons and property; and the Court finds that there is probable cause to believe that the Respondent committed each of the offenses alleged in the State's Petition for Discretionary Transfer.

The Court finds the Respondent is of excessive sophistication and the Respondent's level of maturity is excessive to be tried as an adult and to aid an attorney in his defense. After considering all the testimony, diagnostic study, social evaluation,

and full investigation, the Court finds it is contrary to the best interest of the public to retain jurisdiction.

The Court finds for the welfare of the community, the seriousness of the alleged offenses and the background of the Respondent, that criminal proceedings are required.

L.W. does not complain of the findings regarding probable cause or that the offenses are felonies and offenses against persons and property. He argues that the court did not "show its work" as to its other 54.02(a) findings and the following findings regarding the section 54.02(f) factors:

adult pattern of living; the sophistication of the child is excessive for his age; and his level of maturity is excessive; the background of the Respondent indicates that the welfare of the community requires criminal prosecution; the previous history of the Respondent indicates a present need for placement of the child in a controlled, structured facility; the public needs protection from the Respondent; the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services and facilities currently available to the Juvenile Court is remote; the

We disagree with L.W.'s analysis. In addition to the findings L.W. complains of, the juvenile court stated that the following were reasons for the court's disposition:

- L.W.'s conduct was willful and violent.

- L.W. used a deadly weapon during the course of the offenses.

- The offenses were premeditated.

- L.W. "has not accepted or responded to supervision at home, in foster care or in detention"

- L.W. "has been violent and exhibited extreme anger while awaiting his hearing," had to be "physically and mechanically restrained due to his violence and anger while in detention" awaiting the transfer hearing, made a replica 3-D assault rifle while in the detention facility, made a comb knife he intended to use to hurt a staff member in detention, and planned to commit an aggravated assault against a staff member while in detention.

- Personal injury resulted to three victims,

- Death resulted to one victim.

- "[T]he offenses were so serious that transfer to a District Court with criminal jurisdiction must be granted."

- L.W. "has been following an adult pattern of living."

The court then set out "specific factual findings made to support the transfer decision." For example, the trial court set out the findings of Dr. Hinton and of Jefferson concerning L.W.'s sophistication, the tactics used by L.W. in each of the offenses, the violent and extreme anger shown by L.W. while in detention, his manipulative nature, and their conclusions concerning L.W. following their social evaluation and fitness to proceed reports. The juvenile court also cited the testimony of L.W.'s foster mother regarding L.W.'s past violent behavior and the escalation of that behavior as further support for the court's findings. The order also cited Jefferson's findings that L.W. hunted his victims and used his youthful appearance to his advantage to commit all of

–20–

the offenses in the State's petition. The court also mentioned Dr. Hinton's testimony that L.W. is more sophisticated than his peers and is a danger to himself and others.

In *Moon*, the only reason stated in the transfer order to explain the juvenile court's waiver of jurisdiction was that the alleged offense was a serious offense. *Moon*, 451 S.W.3d at 50. And the only fact specified in the order in support of that reason was that the alleged offense was an offense against the person. *Id.* The order made no findings about the specifics of the alleged offense. *Id.* at 48. The court of criminal appeals held that waiver of juvenile jurisdiction based on the seriousness of the offense, supported by a fact that did not relate to the alleged offense, constituted an abuse of discretion. *Id.* at 50. That is not the case here. The juvenile court included specific factual recitations to support its findings here and, as such, did not abuse its discretion by ordering certification. *See, e.g. In the Matter of K.M.D.*, 2018 WL 3238142, at *5; *Moon*, 451 S.W.3d at 49 (by showing its work, the juvenile court provides a "sure-footed and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable").

**B.      Issues Two and Three – Legal and Factual Sufficiency of the Evidence**

In his second and third issues, L.W. argues that the evidence is legally and factually insufficient to support the certification and transfer order. L.W. argues the evidence is legally and factually insufficient to support three of the juvenile court's section 54.02(f) findings: (1) his sophistication and maturity; (2) his record and previous history; (3) the lack of prospects of adequate protection of the public from him and the doubtful likelihood of the juvenile system to rehabilitate him. L.W. does not challenge the sufficiency of the evidence to support the finding that the alleged offenses were against persons and property or the finding of probable cause. The juvenile court is obligated to consider the factors set forth in section 54.02(f) to make the determination required under section 54.02(a)(3). Not every factor in section 54.02(f) need weigh

in favor of transfer. *Moon*, 451 S.W.3d at 47. Any combination of the criteria may suffice to support the juvenile court's waiver of jurisdiction. *Id.* at 47 & n.78 (citing *Hidalgo*, 983 S.W.2d at 754, n.16).

### 1) Sufficiency of the evidence

As discussed above, our review of L.W. sufficiency points is a two-step process. First, we must review the specific findings of fact concerning the section 54.02(f) factors under a "traditional sufficiency of the evidence review." *Moon*, 451 S.W.3d at 47.

### a. Sophistication and maturity of L.W.

The juvenile court found that L.W.'s levels of sophistication and maturity weighed in favor of certification. In support of its decision, the court found that "the sophistication of the child is excessive for his age; and his level of maturity is excessive." The court also found that L.W. "has been following an adult pattern of living." The court cited and relied on the testimony and reports of Jefferson and Dr. Hinton. Specifically, the court noted that Jefferson found in his social evaluation that L.W. was excessively sophisticated. The court found that L.W. hunted his victims and listed the premeditation of the offenses, the use of the same tactics in the Texas and Louisiana offenses, and L.W.'s use of his youthful appearance to his advantage to commit these offenses as evidence supporting the finding of sophistication. The court also relied on Dr. Hinton's opinion that L.W. is more sophisticated and more mature than his peers and is a danger to himself and others. Moreover, the record included evidence that L.W. admitted watching violent pornography, "running a train" on at least one woman, regular marijuana use beginning at age 14, use of Xanax and Ecstasy beginning at age 15, and selling drugs from the time he was 14.

Based on the record before us, we conclude that the juvenile court had more than a scintilla of evidence to support its finding that L.W.'s sophistication and maturity weighed in favor of certification as an adult and, thus, it is supported by legally sufficient evidence. *See Moon*, 410

S.W.3d at 371; *see also In the Matter of K.M.D.*, 2018 WL 3238142, at \*4–5 (probation officer's testimony that juvenile had a level of sophistication higher than his peers and evidence of the extremely sophisticated and violent nature of the offense, appellant's drug history, and current age provided more than a scintilla of evidence supporting transfer); *In the Matter of S.G.R.*, 496 S.W.3d at 241–42 (juvenile's admission to criminal activity and frequent possession and use of drugs weighed in favor of waiver of jurisdiction and transfer to criminal district court); *In the Matter of C.M.M.*, 503 S.W.3d 692, 708 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (psychiatrist's testimony that appellant was able to make good decisions when he chose to do so offered more than a scintilla of evidence to support findings of sophistication and maturity).

When conducting a factual sufficiency review, we must consider any evidence contrary to the juvenile court's determination and determine if, after weighing all the evidence, the "juvenile court's finding that appellant was of sufficient sophistication and maturity to be tried as an adult was not so against the great weight and preponderance of the evidence as to be manifestly unjust." *In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *In re K.D.S.*, 808 S.W.2d 299, 303 (Tex. App.—Houston [1st Dist.] 1991, no pet.)). Here, the only reference to immaturity came from Jefferson when he described some of L.W.'s behavior while in detention as "silliness" and "horseplay" caused by immaturity. Jefferson, however, testified that he had no issue with L.W. being tried as an adult in a criminal district court. He concluded that L.W. was of "highly excessive" sophistication, manipulative, and able to use his youthful appearance and immature actions when it benefits him. Having reviewed all of the evidence under the appropriate standard, we hold the juvenile court's determination is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### b.	Record and previous history of L.W.

L.W. next argues that the evidence is legally and factually insufficient to support the juvenile court's findings that L.W.'s background "indicates that the welfare of the community requires criminal prosecution." L.W. complains the trial court failed to provide case-specific reasons for this conclusion and argues that his lack of a prior record contradicts the finding. We disagree. Although L.W. did not have a prior record with the juvenile department, the record established that he had a significant history of behavioral problems, angry outbursts, and violent behavior at home and during his time in detention. L.W. also spent sixteen to seventeen months in a residential treatment program in San Antonio. The transfer order references these facts and the extremely violent behavior that required L.W.'s foster family to restrain L.W. while he was in their care. L.W. has been diagnosed with bipolar disorder but financial constraints have caused L.W. to be inconsistent in taking the medication necessary to treat that condition. Further, the court's findings noted that the evidence suggested L.W. was the perpetrator of two prior sexual assaults in Louisiana at a time when he had medication. Dr. Hinton testified to L.W.'s history of aggressive behavior and noted that the community should be concerned about L.W.'s inability to control his anger and violent outbursts. L.W.'s foster mother testified that he exhibited the same behavior when he lived with her at the age of ten. L.W.'s history also included treatment in two psychiatric treatment facilities and a residential treatment facility. Moreover, the evidence showed that the offenses were premeditated, followed the same plan, used the same tactics, and escalated to the point of murder.

Based on the record before us, we conclude that the juvenile court had more than a scintilla of evidence to support its finding that L.W.'s background indicates that the welfare of the community requires criminal prosecution and, thus, it is supported by legally sufficient evidence.

We further hold the juvenile court's determination is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

<blockquote>
<strong>c.      Prospects of adequate protection of the public and likelihood of rehabilitation by use of services, procedures, and facilities currently available to the juvenile court</strong>
</blockquote>

As to the fourth factor in Section 54.02(f) regarding the prospects for the adequate protection of the public and the likelihood of rehabilitation by the juvenile system, the juvenile court found that the services currently available from the juvenile court would be unlikely to rehabilitate L.W. Additionally, the juvenile court found that due to L.W.'s age, the juvenile system would be unlikely to rehabilitate him before his nineteenth birthday. The court based its determination on the testimony of Jefferson and Dr. Hinton. Jefferson testified that the Department's recommendation that the court transfer L.W. was based in part on the lack of sufficient time to complete rehabilitative programs within the juvenile system. Dr. Hinton testified that any treatment of L.W. would be fairly challenging because he suffers from significant mental health and behavioral health issues that are chronic and long standing. She testified that these challenges would come with a probability of relapse. Dr. Hinton agreed that L.W. is a troubled young man and recommended L.W. be placed in a highly supervised environment. Further, the witnesses from the TJJD did not provide opinions on whether the programs offered by the TJJD would benefit L.W. or whether he would even qualify to participate in those programs.

Moreover, each of the detectives testified that they believed the public needs to be protected from L.W. due to nature of the offenses alleged. Indeed, these offenses were willful and violent, premeditated, and involved the use of a deadly weapon. Even while in detention, L.W. continued to exhibit extreme anger, had to be "physically and mechanically restrained," and planned to commit an aggravated assault against a staff member. Jefferson testified that the public needs

protection from L.W., and he believed the likelihood that L.W. will be rehabilitated through the services available to the juvenile court was remote. His opinions were supported by Dr. Hinton's testing and conclusions. The only witness who advocated for L.W.'s retention in the juvenile system was his mother who, understandably wants to prevent her son from facing a criminal trial.

Based on the record before us, we conclude that the juvenile court had more than a scintilla of evidence to support its finding that consideration of adequate protection of the public as well as the likelihood of reasonable rehabilitation weighed in favor of certification as an adult; and, thus, the finding is supported by legally sufficient evidence.

Considering any evidence that is contrary to the juvenile court's determination and, after weighing all the evidence, we further hold the juvenile court's determination is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

### 2) Abuse of discretion of decision to transfer

Having found the juvenile court's findings supported by legally and factually sufficient proof, we must now review the ultimate waiver decision under an abuse of discretion standard. *Moon*, 451 S.W.3d at 47. We consider, in light of our review of the sufficiency of the evidence, whether the juvenile court's decision represents a reasonably principled application of the law or was essentially arbitrary or made without reference to the statutory criteria for waiver. *Id.* at 47. If the juvenile court correctly applies the statutory criteria, then its waiver decision will generally pass muster under this standard of review. *Id.* at 49; *In re S.G.R.*, 496 S.W.3d at 239; *In re D.A.D.*, No. 05-17-00294-CV, 2017 WL 3976585, at *3 (Tex. App.—Dallas Sept. 11, 2017, pet. denied) (mem. op.).

The record reflects the juvenile court carefully considered this matter. The juvenile court considered the investigating officers' testimony as well as the expert testimony of Dr. Hinton, the opinions of L.W.'s mother and former foster mother, and the testimony of L.W.'s other witnesses.

–26–

The trial court also considered, addressed, and applied the opinions of Jefferson, a probation officer with over thirteen years of experience working with juvenile offenders, who had met with L.W. over thirty times and prepared the social evaluation and investigative report. The court further considered Dr. Hinton's report, Jefferson's report, the various incident reports, the DNA analysis, and M.E.'s autopsy report.

On this record, we cannot say that the juvenile court's decision was arbitrary or made without reference to guiding rules or principles. *See Moon*, 451 S.W.3d at 47. Accordingly, we find no abuse of discretion in the juvenile court's decision to waive jurisdiction and to transfer appellant to district court. We overrule appellant's second and third issues on appeal.

## CONCLUSION

It is undisputed that L.W. is alleged to have committed multiple felonies and was fifteen years old or older at the time he committed the alleged offenses. Each offense was willful, violent, and premeditated. The record is also replete with evidence, including DNA evidence linking L.W. to each complainant, to establish probable cause to believe L.W. committed the alleged offenses. Moreover, the record contains much evidence to support the determination that the welfare of the community requires criminal proceedings because of the seriousness of these alleged offenses and L.W.'s background, including his history of anger and violent behavior. The juvenile court's eleven-page order sets out the allegations, probable cause, and the court's findings in great detail and sets out specific facts from that evidence as to the section 54.02(f) factors. After reviewing the record, we conclude the evidence is legally and factually sufficient to support the juvenile court's findings and find no abuse of discretion in the juvenile court's decision to waive jurisdiction and to transfer appellant to district court. Accordingly, we affirm the juvenile court's

certification and transfer order.

/s/ Robbie Partida-Kipness
ROBBIE PARTIDA-KIPNESS
JUSTICE

190966F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE MATTER OF L.W., A
JUVENILE,

No. 05-19-00966-CV

On Appeal from the 304th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. JD-18-01485-W.
Opinion delivered by Justice Partida-
Kipness. Justices Whitehill and Pedersen,
III participating.

In accordance with this Court's opinion of this date, the juvenile court's certification and transfer order is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 13th day of February, 2020.